AUSA: Sara D. Woodward (313) 226-9180
Task Force Officer: Steven Showers (586) 899-9056

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>27834 Newport Drive, Warren, MI 48088 | )<br>)<br>)<br>)<br>)<br>) | Case: 2:15-mc-51300<br>Assigned To : Steeh, George Caram<br>Description: RE: SEALED MATTER<br>(EOB) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Michigan_____
*(identify the person or describe the property to be searched and give its location)*   :

Please see Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal   *(identify the person or describe the property to be seized)*

Please see Attachment B

**YOU ARE COMMANDED**   to execute this warrant on or before _____ *(not to exceed 14 days)*
in the daytime 6:00 a.m. to 10:00 p.m.   ✓ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the presiding United States Magistrate Judge on duty_____ .
*(United States Magistrate Judge)*

Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
for _____ days *(not to exceed 30)*   until, the facts justifying, the later specific date of _____ .

Date and time issued:   SEP 1 5 2015   9:50a

**R. STEVEN WHALEN**
*Judge's signature*

City and state:   Detroit, MI

R. Steven Whalen, U.S. Magistrate Judge
*Printed name and title*

TAGG_00012

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence
of :

Inventory of the property taken and name of any person(s)
seized:

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

TAGG_00013

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The location known as 27834 Newport Drive, Warren, MI 48088 is identified as follows: a one-story structure, single family home with light brown brick and light brown shingles on the roof. A two-car garage with tan door is attached to the house. The address number 27834 are affixed on the light post in the front yard, directly in front of the front door, black letters with white background. The house sits on the east side of Newport Drive just south of Martin Road.

The premises to be searched includes any appurtenances to the real property that is the SUBJECT PREMISES of 27834 Newport Drive, Warren, MI 48088 and any storage units/outbuildings. The SUBJECT PREMISES include any vehicles located at or near the residence which fall under the dominion and control of the person(s) associated with the SUBJECT PREMISES.

41

## ATTACHMENT B

### Information to be Seized

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Section 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

42

d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  contextual information necessary to understand the evidence described in this attachment.

43

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography and child erotica.

5. Records, information, and items relating to violations of the statutes described above including

   a. Records, information, and items relating to the occupancy or ownership of 27834 Newport Drive, Warren, MI 48088 including utility and telephone bills, mail envelopes, or addressed correspondence; Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

   b. Records and information relating to the identity or location of the persons suspected of violating the statutes described above; and

   c. Records and information relating to sexual exploitation of children, including correspondence and communications between users of Website A.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

44

TAGG_00017

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

45

TAGG_00018

AUSA: Sara D. Woodward        Telephone: 313-226-9180

AO 106 (Rev. 04/10) Application for a Search Warrant        Task Force Agent:        Steven Showers        Telephone: 586-899-9056

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
27834 Newport Drive, Warren, MI 48088

)
)
)
)
)
)
)

Case: 2:15-mc-51300
Assigned To : Steeh, George Caram
Assign. Date : 9/15/2015
Description: RE: SEALED MATTER
(EOB)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the ___Eastern___ District of ___Michigan___, there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed.R.Crim.P.41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2252A(a)(5)(B) | Access with intent to view child pornography |

The application is based on these facts:

See attached AFFIDAVIT.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Task Force Officer Steven Showers
*Printed name and title*

Sworn to before me and signed in my presence.

Date: SEP 1 5 2015

**R. STEVEN WHALEN**

_____
*Judge's signature*

City and state: Detroit, MI

R. Steven Whalen, U.S. Magistrate Judge
*Printed name and title*

TAGG_00019

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

## INTRODUCTION

I, Steven J. Showers, Task Force Officer with the Federal Bureau of Investigation (FBI), currently assigned to the Detroit Division, Macomb County Resident Agency, Clinton Township, Michigan, being duly sworn, depose and state as follows:

1.     I have been employed with the City of Warren Police Department for over 17 years. I have been a Police Detective for approximately five years have investigated various crimes including homicides, narcotic activity, sexual assaults and crimes against children, including child pornography. During the course of these investigations, my duties have included writing search warrants, complaints and arrest warrants, participating in the execution of search warrants, the collection of evidence, interviewing subjects and witnesses of these cases, and testifying at various court proceedings. I am currently assigned to the Macomb Area Computer Enforcement (MACE) task force, which investigates criminal violations of both federal and state child pornography and child exploitation laws.

2.     While working with the FBI, I have investigated federal criminal violations

1

related to high technology or cybercrime, child exploitation, and child pornography. I have gained experience through training and everyday work relating to conducting these types of investigations. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. Moreover, I am a law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251 and 2252A, and I am authorized by the Attorney General to request a search warrant.

3.      Consequently, I am submitting this affidavit in support of a search warrant authorizing a search of 27834 Newport Drive, Warren, MI 48088 (Subject Premises). I am requesting authority to search the entire Subject Premises, including the residential dwelling and any computer and computer media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of a crime.

4.      I am requesting that the search warrant authorize the search of vehicles located at or near the residence which fall under the dominion and control of the person(s) associated with the Subject Premises. The search of these vehicles is to include all internal and external compartments and all containers that may be capable of storing

2

TAGG_00021

computer media or other repositories associated with the storage of child pornographic materials or their instrumentalities contained within the aforementioned vehicles.

5.     The statements contained in this affidavit are based in part on: information provided by FBI Special Agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training and background as a Special Agent (SA) with the FBI. Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

## DEFINITIONS

6.     The following definitions apply to this Affidavit and attachments hereto:

a.     "Bulletin Board" means an Internet-based website that is either secured (accessible with a password) or unsecured, and provides members with the ability to view postings by other members and make postings themselves. Postings can contain text messages, still images, video

3

images, or web addresses that direct other members to specific content the poster wishes. Bulletin boards are also referred to as "internet forums" or "message boards." A "post" or "posting" is a single message posted by a user. Users of a bulletin board may post messages in reply to a post. A message "thread," often labeled a "topic," refers to a linked series of posts and reply messages. Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread. Bulletin boards often also provide the ability for members to communicate on a one-to-one basis through "private messages." Private messages are similar to e-mail messages that are sent between two members of a bulletin board. They are accessible only by the user who sent/received such a message, or by the Website Administrator.

b.    "Chat" refers to any kind of communication over the Internet that offers a real-time transmission of text messages from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

4

c.    "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene or that do not necessarily depict minors in sexually explicit conduct.

d.    "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

e.    "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

f.    "Computer Server" or "Server," as used herein, is a computer that is

5

attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

g.  "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices

6

TAGG_00025

such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h.     "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i.     "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

j.     "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips,

7

TAGG_00026

and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

k. "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet. FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

l. "Host Name." A Host Name is a name assigned to a device connected to a computer network that is used to identify the device in various forms of electronic communication, such as communications over the Internet;

m. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

n. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the

8

TAGG_00027

Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

o.   "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or

9

TAGG_00028

her account name and personal password.

p.   "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are also used by computer servers, including web servers, to communicate with other computers.

q.   Media Access Control ("MAC") address. The equipment that connects a computer to a network is commonly referred to as a network adapter. Most network adapters have a MAC address assigned by the manufacturer of the adapter that is designed to be a unique identifying number. A unique MAC address allows for proper routing of communications on a network. Because the MAC address does not change and is intended to be unique, a MAC address can allow law enforcement to identify whether communications sent or received at different times are associated with the same adapter.

r.   "Minor" means any person under the age of eighteen years. See 18

10

U.S.C. § 2256(1).

s.    The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

t.    "Secure Shell" ("SSH"), as used herein, is a security protocol for logging into a remote server. SSH provides an encrypted session for transferring files and executing server programs.

11

TAGG_00030

u.   "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

v.   "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address.  URLs are made of letters, numbers, and other symbols in a standard form.  People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

w.   "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

x.   "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web

12

servers to various web clients via Hyper-Text Transport Protocol ("HTTP");

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

7. DEREK TAGG has been linked to an online community of individuals who regularly send and receive child pornography via a website that operated on an anonymous online network. The website is described below and referred to herein as "Website A."[1] There is probable cause to believe that DEREK TAGG knowingly accessed with intent to view, possessed, and received child pornography via "Website A."

### The Network[2]

8. "Website A" operated on a network ("the Network") available to Internet users who are aware of its existence. The Network is designed specifically to facilitate anonymous communication over the Internet. In order to access the Network, a user must install computer software that is publicly available, either by downloading

---

[1] The actual name of "Website A" is known to law enforcement. Disclosure of the name of the site would potentially alert its members to the fact that law enforcement action is being taken against the site and its users, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence. Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified as "Website A."

[2] The actual name of the Network is known to law enforcement. The network remains active and disclosure of the name of the network would potentially alert its members to the fact that law enforcement action is being taken against the network, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence. Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the network

13

software to the user's existing web browser, downloading free software available from the Network's administrators, or downloading a publicly-available third-party application.[3] Using the Network prevents someone attempting to monitor an Internet connection from learning what sites a user visits and prevents the sites the user visits from learning the user's physical location. Because of the way the Network routes communication through other computers, traditional IP identification techniques are not viable.

9.     Websites that are accessible only to users within the Network can be set up within the Network and "Website A" was one such website. Accordingly, "Website A" could not generally be accessed through the traditional Internet.[4] Only a user who had installed the appropriate software on the user's computer could access "Website A." Even after connecting to the Network, however, a user had to know the exact web address of "Website A" in order to access it. Websites on the Network are not indexed in the same way as websites on the traditional Internet. Accordingly, unlike on the traditional Internet, a user could not simply perform a Google search for the name of

---

will be identified as "the Network."

3       Users may also access the Network through so-called "gateways" on the open Internet, however, use of those gateways does not provide users with the full anonymizing benefits of the Network.

4       Due to a misconfiguration, prior to February 20, 2015, Website A was occasionally accessible through the traditional Internet. In order to access Website A in that manner, however, a user would have had to know the exact IP address of the computer server that hosted Website A, which information was not publicly available. As of on or about February 20, 2015, Website A was no longer accessible through the traditional Internet.

14

"Website A," obtain the web address for "Website A," and click on a link to navigate to "Website A." Rather, a user had to have obtained the web address for "Website A" directly from another source, such as other users of "Website A," or from online postings describing both the sort of content available on "Website A" and its location. Accessing "Website A" therefore required numerous affirmative steps by the user, making it extremely unlikely that any user could have simply stumbled upon "Website A" without first understanding its content and knowing that its primary purpose was to advertise and distribute child pornography.

10.     The Network's software protects users' privacy online by bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address which could otherwise be used to identify a user.

11.     The Network also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, or an instant messaging server. Within the Network itself, entire websites can be set up which operate the same as regular public websites with one critical exception - the IP address for the web server is hidden and instead is replaced with a Network-based web address. A user can only reach such sites if the user is using the Network client and operating in the Network. Because neither a user nor law enforcement can identify the

15

TAGG_00034

actual IP address of the web server, it is not possible to determine through public lookups where the computer that hosts the website is located. Accordingly, it is not possible to obtain data detailing the activities of the users from the website server through public lookups.

Description of "Website A" and its Content

12.    "Website A" was a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children, including the safety and security of individuals who seek to sexually exploit children online. On or about February 20, 2015, the computer server hosting "Website A" was seized from a web-hosting facility in Lenoir, North Carolina. The website operated in Newington, Virginia, from February 20, 2015, until March 4, 2015, at which time "Website A" ceased to operate. Between February 20, 2015, and March 4, 2015, law enforcement agents acting pursuant to an order of the United States District Court for the Eastern District of Virginia monitored electronic communications of users of "Website A." Before, during, and after its seizure by law enforcement, law enforcement agents viewed, examined and documented the contents of "Website A," which are described below.

13.    According to statistics posted on the site, "Website A" contained a total of 117,773 posts, 10,622 total topics, and 214,898 total members as of March 4, 2015.

16

The website appeared to have been operating since approximately August 2014, which is when the first post was made on the message board. On the main page of the site, located to either side of the site name were two images depicting partially clothed prepubescent girls with their legs spread apart, along with the text underneath stating, "No cross-board reposts, .7z preferred, encrypt filenames, include preview, Peace out." Based on my training and experience, I know that: "no cross-board reposts" refers to a prohibition against material that is posted on other websites from being "re-posted" to "Website A;" and ".7z" refers to a preferred method of compressing large files or sets of files for distribution. Two data-entry fields with a corresponding "Login" button were located to the right of the site name. Located below the aforementioned items was the message, "Warning! Only registered members are allowed to access the section. Please login below or 'register an account' [(a hyperlink to the registration page)] with "[Website A]." Below this message was the "Login" section, consisting of four data-entry fields with the corresponding text, "Username, Password, Minutes to stay logged in, and Always stay logged in."

14.     Upon accessing the "register an account" hyperlink, there was a message that informed users that the forum required new users to enter an email address that looks to be valid. However, the message instructed members not to enter a real email address. The message further stated that once a user registered (by selecting a user name and

17

password), the user would be able to fill out a detailed profile. The message went on to

warn the user "[F]or your security you should not post information here that can be

used to identify you." The message further detailed rules for the forum and provided

other recommendations on how to hide the user's identity for the user's own security.

15.     After accepting the above terms, registration to the message board then required

a user to enter a username, password, and e-mail account; although a valid e-mail

account was not required as described above.

16.     After successfully registering and logging into the site, the user could access

any number of sections, forums, and sub-forums. Some of the sections, forums, and

sub-forums available to users included: (a) How to; (b) General Discussion; (c)

[Website A] information and rules; and (d) Security & Technology discussion.

Additional sections, forums, and sub-forums included (a) Jailbait – Boy; (b) Jailbait –

Girl; (c) Preteen – Boy; (d) Preteen – Girl; (e) Pre-teen Videos – Girl HC; (f) Pre-teen

Videos – Boys HC; (g) Toddlers; and (h) Kinky Fetish – Scat. Based on my training

and experience, I know that "jailbait" refers to underage but post-pubescent minors; the

abbreviation "HC" means hardcore (i.e., depictions of penetrative sexually explicit

conduct); and "scat" refers to the use of feces in various sexual acts, watching someone

defecating, or simply seeing the feces.  An additional section and forum was also listed

in which members could exchange usernames on a Network-based instant messaging

18

service that I know, based upon my training and experience, to be commonly used by subjects engaged in the online sexual exploitation of children.

17.    A review of the various topics within the above forums revealed each topic contained a title, the author, the number of replies, the number of views, and the last post. The "last post" section of a particular topic included the date and time of the most recent posting to that thread as well as the author. Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included in the post thread below it. Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

18.    A review of the various topics within the "[Website A] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums revealed that the majority contained general information in regards to the site, instructions and rules for how to post, and welcome messages between users.

19.    A review of topics within the remaining forums revealed the majority contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers. Examples of these are as follows:

19

TAGG_00038

a.   On February 3, 2015, a user posted a topic entitled "Buratino-06" in the forum "Pre-teen – Videos - Girls HC" that contained numerous images depicting child pornography of a prepubescent or early pubescent girl. One of these images depicted the girl being orally penetrated by the penis of a naked male;

b.   On January 30, 2015, a user posted a topic entitled "Sammy" in the forum "Pre-teen – Photos – Girls" that contained hundreds of images depicting child pornography of a prepubescent girl. One of these images depicted the female being orally penetrated by the penis of a male; and

c.   On September 16, 2014, a user posted a topic entitled "9yo Niece - Horse.mpg" in the "Pre-teen Videos - Girls HC" forum that contained four images depicting child pornography of a prepubescent girl and a hyperlink to an external website that contained a video file depicting what appeared to be the same prepubescent girl. Among other things, the video depicted the prepubescent female, who was naked from the waist down with her vagina and anus exposed, lying or sitting on top of a naked adult male, whose penis was penetrating her anus.

20.   A list of members, which was accessible after registering for an account, revealed that approximately 100 users made at least 100 posts to one or more of the

20

TAGG_00039

forums. Approximately 31 of these users made at least 300 posts. In total, "Website A"

contained thousands of postings and messages containing child pornography images.

Those images included depictions of nude prepubescent minors lasciviously exposing

their genitals or engaged in sexually explicit conduct with adults or other children.

21.   "Website A" also included a feature referred to as "[Website A] Image Hosting."

This feature of "Website A" allowed users of "Website A" to upload links to images of

child pornography that are accessible to all registered users of "Website A." On

February 12, 2015, an FBI Agent accessed a post on "Website A" titled "Giselita"

which was created by a particular "Website A" user. The post contained links to

images stored on "[Website A] Image Hosting." The images depicted a prepubescent

girl in various states of undress. Some images were focused on the nude genitals of a

prepubescent girl. Some images depicted an adult male's penis partially penetrating the

vagina of a prepubescent girl.

22.   Text sections of "Website A" provided forums for discussion of methods and

tactics to use to perpetrate child sexual abuse. For example, on January 8, 2015, a user

posted a topic entitled "should i proceed?" in the forum "Stories - Non-Fiction" that

contained a detailed accounting of an alleged encounter between the user and a 5 year

old girl. The user wrote "...it felt amazing feeling her hand touch my dick even if it was

through blankets and my pajama bottoms..." The user ended his post with the question,

21

TAGG_00040

"should I try to proceed?" and further stated that the girl "seemed really interested and was smiling a lot when she felt my cock." A different user replied to the post and stated, "...let her see the bulge or even let her feel you up...you don't know how she might react, at this stage it has to be very playful..."

### Court Authorized Use of Network Investigative Technique

23.    Websites generally have Internet Protocol ("IP") address logs that can be used to locate and identify the site's users. In such cases, after the seizure of a website whose users were engaging in unlawful activity, law enforcement could review those logs in order to determine the IP addresses used by users of "Website A" to access the site. A publicly available lookup could then be performed to determine what Internet Service Provider ("ISP") owned the target IP address. A subpoena could then be sent to that ISP to determine the user to which the IP address was assigned at a given date and time.

24.    However, because of the Network software utilized by "Website A," any such logs of user activity would contain only the IP addresses of the last computer through which the communications of "Website A" users were routed before the communications reached their destinations. The last computer is not the actual user who sent the communication or request for information, and it is not possible to trace such communications back through the Network to that actual user. Such IP address

22

logs therefore could not be used to locate and identify users of "Website A."

25.     Accordingly, on February 20, 2015, the same date "Website A" was seized, the United States District Court for the Eastern District of Virginia authorized a search warrant to allow law enforcement agents to deploy a Network Investigative Technique ("NIT") on "Website A" in an attempt to identify the actual IP addresses and other identifying information of computers used to access "Website A." Pursuant to that authorization, between February 20, 2015, and approximately March 4, 2015, each time any user or administrator logged into "Website A" by entering a username and password, the FBI was authorized to deploy the NIT which would send one or more communications to the user's computer. Those communications were designed to cause the receiving computer to deliver to a computer known to or controlled by the government data that would help identify the computer, its location, other information about the computer, and the user of the computer accessing "Website A." That data included: the computer's actual IP address, and the date and time that the NIT determined what that IP address was; a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish the data from that of other computers; the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86); information about whether the NIT had already been delivered to the computer; the computer's

23

Host Name; the computer's active operating system username; and the computer's MAC address.

## **derpderk** ON "Website A"

26.     According to data obtained from logs on "Website A," monitoring by law enforcement, and the deployment of a NIT, a user with the user name **derpderk** engaged in the following activity on "Website A."

27.     The profile page of user **derpderk** indicated this user originally registered an account on "Website A" on January 19, 2015. Profile information on "Website A" may include contact information and other information that is supplied by the user. It also contains information about that user's participation on the site, including statistical information about the user's posts to the site and a categorization of those posts. According to the user **derpderk** profile, this user was a Newbie Member of "Website A," has a hostname of "derek" and a logon name of "derek".

28.     Further, according to the Statistics section of this user's profile, the user **derpderk** had been actively logged into the website for a total of 5 hours, 7 minutes between the dates of January 19, 2015 and March 4, 2015.

## IP Address and Identification of User **derpderk** on "Website A"

29.     According to data obtained from logs on "Website A," monitoring by law enforcement, and the deployment of a NIT, on February 23, 2015, the user **derpderk**

24

TAGG_00043

engaged in the following activity on "Website A" from IP address 73.161.123.130. During the session described below, this user browsed "Website A" after logging into "Website A" with a username and a password.

30.     On February 23, 2015, the user **derpderk** with IP address 73.161.123.130 accessed the post entitled 'video collection clow 85' which was located in the subdirectory 'Pre-teen Videos>>Girls HC>>video collection clow85'. Among other things, this post contained hyperlinks to JPG files and a password. Other users later commented on the post to include one by 'Hermann': "…But thanks, the one I can see is quite hot. ***edit*** Server is better now. I can see vids 1-3, only the last seems corrupt. Nice blowjobs!"

31.     During the following additional sessions, the user **derpderk** also browsed "Website A" after logging into "Website A" with a username and password. During these sessions, the user's IP address information was not collected.

    a.     On March 4, 2015, the user **derpderk** accessed a post that contained a link to an image that depicted thumbnails of a video in which a prepubescent girl performs oral sex on an adult male penis and then is anally penetrated by the male.

    b.     On March 4, 2015, the user **derpderk** accessed a post that contained a link to an image that depicted thumbnails of a video in which the vagina

25

TAGG_00044

and anus of a prepubescent girl is fondled and penetrated by the finger of an adult male.

32.    Using publicly available websites, FBI Special Agents were able to determine that the above IP Address (73.161.123.130) was operated by the Internet Service Provider ("ISP") Comcast.

33.    In March 2015, an administrative subpoena/summons was served to Comcast requesting information related to the user who was assigned to the above IP address. According to the information received from Comcast, Tim Picmann is receiving Internet service at the address of the SUBJECT PREMISES with an installation date of November 16, 2010. Internet service was current as of February 25, 2015 at the aforementioned premises.

34.    A search of Accurint information database (a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, etc.) was conducted for the SUBJECT PREMISES (27834 Newport Drive, Warren, MI 480880. These public records indicated the residents of the SUBJECT PREMISES include DEREK TAGG.

35.    On or about August 10, 2015, I reviewed the Michigan Department of Motor Vehicles (DMV) database using queries for DEREK MICHAEL TAGG with a date of birth in September XX, 1986. The results indicated that TAGG currently resides at the

TAGG_00045

SUBJECT PREMISES.

36.     Among the information collected by the NIT when it was deployed against derpderk was the host and/or logon name "Derek."

37.     On or about August 20, 2015, police conducting surveillance of the SUBJECT PREMISES observed DEREK TAGG exit the SUBJECT PREMISES and enter into a vehicle that is registered with the Michigan Secretary of State to DEREK TAGG. Surveilling officers identified DEREK TAGG as the driver of the vehicle based on comparisons with TAGG's Michigan Driver's license and photographs obtained from Tagg's Facebook.com account. DEREK TAGG then drove to his place of employment at Bestbuy at in Utica, MI. DEREK TAGG was then seen exiting his motor vehicle before entering his place of employment.

38.     A check of Facebook.com page for "Derek Laser Tagg" revealed a photograph that matched the Michigan Driver's License photograph for DEREK TAGG. TAGG'S Facebook page also indicated that he lives in Warren and works at Bestbuy.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW [AND/OR COLLECT, RECEIVE, DISTRIBUTE OR ADVERTISE] CHILD PORNOGRAPHY

39.     Based on my previous investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to

27

individuals who utilize web based bulletin boards to access with intent to view, possess, collect and receive images of child pornography:

a.   Individuals who access with intent to view, possess, collect, and receive images child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.   Individuals who access with intent to view, possess, collect, and receive images of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   Individuals who access with intent to view, possess, collect, and receive child pornography almost always possess and maintain their "hard

28

copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d. Likewise, individuals who access with intent to view, possess, collect and receive child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e. Individuals who access with intent to view, possess, collect and receive child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names,

29

TAGG_00048

addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.    Individuals who would have knowledge about how to access a hidden and embedded bulletin board would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g.    Individuals who access with intent to view, possess, collect, and receive child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

40.    Based on the following, I believe that a user of the Internet account at SUBJECT PREMISES, likely displays characteristics common to individuals who access with the intent to view and/or, possess, collect, receive, or distribute child pornography. For example: username "**derpderk**" accessed 163 message board threads that all had links

30

to images and videos of child pornography. A few of those threads had names indicative of child pornography, including "Drug(g)ed sleeping girl 10yo fuck –"; "girl Toy3-8y&man" and "PTHC Anal dildo".

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

41.   Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

42.   Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily

31

transferred from the camcorder to a computer.

43.    A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

44.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb,"

TAGG_00051

"jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Media storage devices can easily be concealed and carried on an individual's person.

45.    The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

46.    Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

47.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or

33

TAGG_00052

saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

48.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following two reasons:

   a.     Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data

34

TAGG_00053

that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on-site.

b.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

49.     In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In cases involving child pornography where the evidence consists partly of graphics files, the

35

monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

50.     Furthermore, because there is probable cause to believe that the computer and its storage devices are all instrumentalities of crimes, within the meaning of 18 U.S.C. §§ 2251 through 2256, they should all be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED REGARDING ELECTRONIC DATA

51.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

    a.     on-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

36

b.    on-site forensic imaging of any computers that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for examination; such imaging may require several hours to complete and require law enforcement agents to secure the search scene until that imaging can be completed;

c.    examination of all of the data contained in such computer hardware, computer software, or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

d.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

e.    surveying various file directories and the individual files they contain;

f.    opening files in order to determine their contents;

37

TAGG_00056

g.   scanning storage areas;

h.   performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in **Attachment B**; and

i.   performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in **Attachment B**.

## REQUEST FOR SEALING

52.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into a criminal organization and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness. Further, this

38

TAGG_00057

affidavit describes a law enforcement technique in sufficient detail that disclosure of this technique could assist others in thwarting its use in the future.

## Conclusion

53.    Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the SUBJECT PREMISES, described in Attachment A. I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, authorizing the seizure and search of the items described in Attachment B.

TAGG_00058

54.     Your Affiant is aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.


_____

Task Force Officer Detective Steven Showers
Federal Bureau of Investigation


Sworn to me this 15th day of September, 2015

R. STEVEN WHALEN

_____

R. STEVEN WHALEN
United States Magistrate Judge


40

TAGG_00059

# ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The location known as 27834 Newport Drive, Warren, MI 48088 is identified as follows: a one-story structure, single family home with light brown brick and light brown shingles on the roof. A two-car garage with tan door is attached to the house. The address number 27834 are affixed on the light post in the front yard, directly in front of the front door, black letters with white background. The house sits on the east side of Newport Drive just south of Martin Road.

The premises to be searched includes any appurtenances to the real property that is the SUBJECT PREMISES of 27834 Newport Drive, Warren, MI 48088 and any storage units/outbuildings. The SUBJECT PREMISES include any vehicles located at or near the residence which fall under the dominion and control of the person(s) associated with the SUBJECT PREMISES.

41

TAGG_00060

# ATTACHMENT B

## Information to be Seized

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Section 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

42

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

43

TAGG_00062

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography and child erotica.

5. Records, information, and items relating to violations of the statutes described above including

    a. Records, information, and items relating to the occupancy or ownership of 27834 Newport Drive, Warren, MI 48088 including utility and telephone bills, mail envelopes, or addressed correspondence; Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

    b. Records and information relating to the identity or location of the persons suspected of violating the statutes described above; and

    c. Records and information relating to sexual exploitation of children, including correspondence and communications between users of Website A.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

44

TAGG_00063

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

TAGG_00064